# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

MAYRA GUZMAN-FONALLEDAS, et al.,

Plaintiffs,

v.

HOSPITAL EXPAÑOL AUXILIO MUTUO, et al.,

Defendants.

CASE NO. 16-1602 (GAG)

## OPINION AND ORDER

Plaintiffs Mayra Guzmán-Fonalledas and Roberto Resto-Martínez sued Defendants Hospital Español Auxilio Mutuo de Puerto Rico, Inc., et al., for negligence under Puerto Rico law.[1] (Docket No 28). They allege that Defendants breached the standard of care by misreading a pathology report and forcing Guzmán-Fonalledas to undergo an unnecessary medical procedure with negative consequences over her wellbeing. Plaintiffs have proffered three expert witnesses and Defendants move to limit the scope of two experts' testimony and disqualify the third. (Docket Nos. 130-32).

**I.  Relevant Factual and Procedural Background**

Plaintiff Mayra Guzmán-Fonalledas, a member of the Auxilio Mutuo Medical Plan, complained of reflux to Dr. Salmone-Velilla during a routine visit in early 2015. (Docket No. 28

---

[1] The other Defendants are: Rafael J. Pastrana-Laborde, Integrated Pathology, PSC; Nella Fernández; Víctor Carlo-Vargas; Puerto Rico Medical Defense Insurance Company; Jorge I. Pelet-Mejías; Continental Casualty Company as the insurer for Dr. Rafael Pastrana-Laborde; RenaissanceRe Syndicate Limited as the Insurer for Hospital Auxilio Mutuo; Sindicato de Aseguradores de Impericia Médica; Dorián López-Bracety; Lourdes Del Toro; Yanira Pagán; Conjugal Partnership Pastrana-Lopez; Conjugal Partnership Doe-Fernandez; Conjugal Partnership Carlo-Pagan; Conjugal Partnership Pelet-Del Toro; and an alphabet of space-holding John Does and ABC insurance corporations.

¶ 3.1-3.2). Subsequently, Dr. Pastrana-Laborde, a gastroenterologist. performed an endoscopy, in which he extracted tissue from a gastric polyp. Id. ¶ 3.3). The tissue was sent to Integrated Psychology Services ("IPS"), where Dr. Nella Fernández diagnosed an adenocarcinoma, a type of cancer. Id. ¶ 3.4. Her colleague, Dr. Víctor Carlo-Vargas, concurred with the diagnosis. Id. As a result, Dr. Pastrana-Laborde informed Guzmán-Fonalledas of her cancer diagnosis and ordered additional studies. Id. ¶ 3.5. In a follow-up appointment, Dr. Pastrana-Laborde ordered Guzmán-Fonalledas to undergo a gastrectomy, and referred her to Dr. Pelet-Mejías for surgery. Id. ¶ 3.8.

Dr. Pelet-Mejías conducted a total gastrectomy, and sent tissue from the surgery to IPS, which revealed that Guzmán-Fonalledas actually did not have gastric cancer but rather a "neuroendocrine neoplasm low grade 1.1 cm in size," a benign or low grade lesion. Id. ¶ 3.9. Two weeks after the pathology report was issued, Guzmán-Fonalledas attended a follow-up appointment with Dr. Salmone-Velilla of the Auxilio Mutuo External Clinics, who did not inform her of the pathology report, and referred her to Dr. Lozada-Costas, an oncologist in the hospital. Id. ¶ 3.10.

But at the behest of a friend, Guzmán-Fonalledas contacted another oncologist, Dr. Báez-Díaz, who suspected that she was misdiagnosed and subjected to an unnecessary surgical proceeding. Id. ¶ 3.11. Dr. Báez-Díaz called Dr. Pelet-Mejías, the surgeon, who allegedly acknowledged that the two pathological reports were incompatible and "concealed from Ms. Guzmán that the tissue he had actually removed the day of the surgery, had not been diagnosed as an adenocarcinoma." Id. ¶ 3.12. Dr. Báez-Díaz also asked Dr. Carlo-Vargas to review the polyp tissue from the endoscopy, which he did, and consequently acknowledged that the original diagnosis was incorrect. Id. ¶ 3.14.

A month after the pathologist, Dr. Carlo-Vargas, confirmed the misdiagnosis, Guzmán-Fonalledas attended a follow-up appointment with the Auxilio Mutuo's oncologist, Dr. Lozada-Costas. Id. ¶ 3.16. He told her she did not need cancer therapy but omitted that she did not have an adenocarcinoma and that the surgery was unnecessary. Id. On the same day, in a similar follow-up visit, Dr. Pastrana-Laborde, the gastroenterologist, made the same assertions and omissions as Dr. Lozada-Costas. Id. ¶ 3.17.

Plaintiffs allege that the unnecessary surgical procedure "has been devastating." Id. ¶ 3.19. "If the correct diagnosis had been made in the First Biopsy, then a local resection would have been more than adequate to cure Ms. Guzmán Fonalledas." Id. ¶ 3.18. But instead, as a result, Guzmán-Fonalledas suffers difficulty tolerating food and has lost more than eighty pounds; at the time of her complaint, she weighed eighty-seven pounds. Id. ¶ 3.19. Upon medical advice, she sought treatment at the Moffit Cancer Center in Tampa, Florida. Id. ¶ 3.20. And as of filing her complaint, she was fed through a gastro-intestinal tube through her nose, and "her condition is extremely serious and life threatening." Id. ¶ 3.21.

Plaintiffs announced three expert witnesses for trial. First is Gerri Pennachio, who "will testify regarding his review of the pertinent medical records and Mayra Guzmán-Fonalledas'[s] condition and the expected life care expenses." (Docket No. 125 at 87). She has an MA in Vocational Rehabilitation Counseling and a BS in Therapeutic Recreation. (Docket No. 131-2). For almost forty years she has worked as a Certified Rehabilitation Counselor, Certified Life Care Planner, and Certified Vocational Evaluator at Counseling and Rehabilitation Associates in Lakeland, Florida. Id. Her duties include "Medical case management," "Vocational/personal counseling and guidance for disabled individuals," and "Personal Injury Litigation Testimony." Id.

The second expert is Dr. Daniel Steven Timmerman, who "will testify regarding his review of the pertinent medical records and Defendants' medical malpractice and negligence, as set forth in the Second Amended Complaint and in his expert report." (Docket No. 125 at 87). He is a board-certified surgeon with years of experience, and has performed hundreds or thousands of adenocarcinoma surgeries, including between forty and fifty stomach cancer surgeries. (Docket Nos. 130-2; 136 at 11-12).

The third expert is Dr. William L. Manion, who "will testify regarding his review of the pertinent medical records and Defendants' medical malpractice and negligence, as set forth in the Second Amended Complaint and in his expert report." (Docket No. 125 at 87). He holds an MD, PhD, JD, and an MBA, and is the President and CEO of Diagnostic Pathology Consultants, the Designated Forensic Pathologist in Burlington and Ocean Counties, and the Chairman of the Pathology Department in Memorial Hospital of Salem County, among other things. (Docket No. 132-2). Upon reviewing eight records, including Guzmán-Fonalledas's medical records, various depositions, and Dr. Timmerman's expert report, he concluded that:

> [I]t would be my opinion to a reasonable degree of medical and surgical pathology certainty that the failure to diagnosis the low grade neuroendocrine adenocarcinama and mistakenly identify it as a gastric adenocarcinoma constitutes a significant deviation from the usual standards of medical care. As a result of the diagnosis of adenocarcinoma the patient underwent a much more aggressive surgery that included the entire removal of her stomach. This is reasonable as gastric adenocarcinomas can infiltrate through the submucosa and spread in a *linitis plastica* pattern. As a result of the gastrectomy with *esophagojejunal anastomosis* the patient now has very serious medical problems and has lost sixty pounds. If the correct diagnosis had been made of low grade neuroendocrine neoplasm then a local resection of the tumor would have been more than adequate to cure Mayra Guzman of the tumor. This would have allowed her to maintain her stomach so that she could maintain her normal nutritional status. Instead a complete gastrectomy was performed with an *esophagojejunal anastomosis* that has now left the patient with severe symptoms and life threatening weight loss. I hold all opinions to a reasonable degree of medial and forensic certainty.

(Docket 132-3 at 2-3).

Civil No. 16-1602 (GAG)

In response to Plaintiffs' expert witnesses, Defendants filed motions in limine to limit the scope of Pennachio and Dr. Timmerman's testimony, and to disqualify Dr. Manion altogether as unqualified and unreliable. See Docket Nos. 130-32.

**II.    Discussion**

Defendants challenge Pennachio, Dr. Timmerman and Dr. Manion's qualifications as experts and move to limit the scope of their testimony to their areas of expertise. They also move to exclude Dr. Manion's testimony because they contend he is only qualified to testify as a pathologist and his opinion lacks a reliable basis.

To admit expert testimony, the Court must first qualify the witness as an expert. Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc., 124 F.3d 252 (1st Cir. 1997) ("The trial court first must determine whether the putative expert is 'qualified . . . .'") (citing Bogosian v. Mercedes-Benz of N.A., Inc., 104 F.3d 472, 476 (1st Cir. 1997)). For this, it must consider "whether the putative expert is qualified by knowledge, skill, experience, training, or education," to offer testimony. Pagés-Ramirez v. Ramírez Gonzáez, 605 F.3d 109, 113 (1st Cir. 2010) (citing Mitchell v. United States, 141 F.3d 8, 14 (1st Cir. 1998)). And as the First Circuit has explained, "[t]he proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline." Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar, 345 F.3d 15, 24 (1st Cir. 2003).

Once a witness has been qualified as an expert, Federal Rule of Evidence 702 governs the admission of expert testimony. Rule 702 requires that expert testimony (1) be "based on sufficient facts or data;" (2) be "the product of reliable principles and methods;" and (3) that the witness apply "the principles and methods reliably" to the particular facts of the case. FED R. EVID. 702. This Rule is read alongside the liberal relevance requirement of Rule 401. Id. 401; Daubert v.

**Civil No. 16-1602 (GAG)**

Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 587 (1993) ("[T]he Rule's basic standard of relevance thus is a liberal one."). Hence in Daubert, the Supreme Court interpreted Rule 702 as requiring the judge to determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Daubert, 509 U.S. at 592-93. Simplified, the Court must determine the evidence's relevance and reliability. See Pagés-Ramírez, 605 F.3d at 113 (citing United States v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002) ("The judge must ensure that an expert's testimony 'both rests on a reliable foundation and is relevant to the task at hand.'")). And in its determination, the trial court serves a gatekeeping function to ensure the witness's "specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue[.]" Pagés-Ramirez, 605 F.3d at 113 (citing Gaydar, 345 F.3d at 24).

In Daubert, the Supreme Court listed four factors to determine an expert's testimony's reliability, but "d[id] not presume to set out a definitive checklist or test." Daubert, 509 U.S. at 593. The First Circuit has held that the proponent of expert testimony does not need to prove that the expert is correct, but "must show only that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." Milward v. Acuity Specialty Prod. Grp., Inc., 639 F.3d 11, 15 (1st Cir. 2011). Most pertinent here, in the case of a medical expert, the First Circuit has held that the expert's knowledge "rests on a reliable foundation" just based on the expert's "medical education and many years of experience in the field." Pagés-Ramirez, 605 F.3d at 116. The rationale for this permissive standard is simple and based on the adversarial process: "So long as an expert's scientific testimony rests upon '"good grounds," based on what is known,' it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities." Id. (citing Daubert, 509 U.S. at 590, 596) (internal

**Civil No. 16-1602 (GAG)**

citations omitted). The right approach, the Supreme Court explained in Daubert, is to use "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" to attack "shaky but admissible evidence." Daubert, 509 U.S. at 596.

Here, all three expert witnesses are qualified for their proposed use.

*1. Pennachio*

Pennachio "will testify regarding [her] review of the pertinent medical records and Mayra Guzmán-Fonalledas'[s] condition and the expected life care expenses." (Docket No. 125 at 87). Defendants concede that she has expertise "in the area of life care planning," but argue that she is not qualified to testify about any other topic. (Docket No. 131 at 6). Although she is not a medic, she carries forty years of experience managing medical cases and providing counseling and guidance for disabled individuals. She also received a BS in therapeutic recreation and an MA in vocational rehabilitation counseling, and thus her curriculum vitae qualifies her to testify about Guzmán-Fonalledas's condition in the context of her medical records and expected life care expenses. Should Pennachio exceed the bounds of her intellectual authority, Defendants will be able to highlight such excesses in cross-examination, and the jury will afford the pertinent weight to her testimony.

*2. Dr. Timmerman*

Dr. Timmerman is also qualified to testify regarding his review of pertinent medical records and Defendants' medical malpractice and negligence. Defendants wish to limit Dr. Timmerman's testimony to his expertise as a surgeon, and exclude his testimony as to pathology. But the First Circuit made clear in Gaydar, "[t]he proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline." 345 F.3d at 24 (holding that "the mere fact that [an expert] was not a gynecologist does not mean

**Civil No. 16-1602 (GAG)**

that he was not qualified to give expert testimony regarding [the Plaintiff's] pregnancy"). As a board-certified surgeon with years of experience and dozens of stomach cancer surgeries under his belt, Dr. Timmerman could very well testify about Defendants' medical malpractice, e.g., on how to detect said cancers or conduct the appropriate surgeries for different kinds of tumors. Thus, as Plaintiffs argue, Dr. Timmerman's opinion could assist the Court in its determination of negligence in every issue inside the scope of medical practice. See Docket No. 136 at 4.

*3. Dr. Manion*

The same reasoning applied for Dr. Timmerman's qualifications applies to Dr. Manion. As a doctor and pathologist, he can also testify regarding his review of pertinent medical records and Defendants' medical malpractice and negligence. Granted, Dr. Manion stated in his deposition that his testimony would be limited to the pathology aspect of the case. (Docket No. 132-1 at 10). If he digresses into other areas, Defendants may try to impeach his credibility on cross-examination. But this alone does not disqualify him as an expert on medical topics.

Defendants also contest Dr. Manion's reliability because he did not examine the pathology slides of the original diagnosis and "his deposition testimony established that the stated conclusions are not the result of the analysis of any evidence but rather the adoption of conclusions from third parties and then well outside the scope of his area of expertise." (Docket No. 132 at 2). But the fact that he concluded that Defendants deviated from the usual standards of medical care without looking at the pathological slides also raises an issue for cross-examination. It does not disqualify him as an expert witness and does not prove his opinion lacked a reliable foundation, as Defendants argue. His mere status as a doctor with three decades of experience, per First Circuit precedent, establishes a reliable foundation. See Pagés-Ramirez, 605 F.3d at 116 (finding that the expert's knowledge "rests on a reliable foundation" based on the expert's "medical education and

many years of experience in the field"). Moreover, his opinion is reliable because it is based on his review of four depositions, three medical records, two letters, and Dr. Timmerman's report. (Docket Nos. 132-3; 132-4). A review of these exhibits further reveals that he is not merely adopting others' conclusions, as Defendants argue. Instead, he is analyzing the record and others' conclusions in chronological order to determine that, if what these records say (or fail to say) is true, Defendants acted negligently.

**III. Conclusion**

For the reasons above, Defendants' motions in limine at Docket Nos. 130-32 are **DENIED**.

**SO ORDERED.**

In San Juan, Puerto Rico this 23rd day of April, 2018.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge